IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 3, 2021 Session

## STATE OF TENNESSEE v. JAMES MCCLAIN

**Appeal from the Circuit Court for Madison County**
**No. 19-214     Kyle Atkins, Judge**

_____

### No. W2019-01217-CCA-R3-CD

_____

The defendant, James McClain, appeals his Madison County Circuit Court jury convictions of aggravated assault and witness coercion, claiming that the trial court erred by permitting him to represent himself at trial, by permitting the State to proceed on an amended indictment, and by imposing consecutive sentences. Because the record establishes that the defendant knowingly, voluntarily, and intelligently waived his right to counsel, that the indictment was not amended, and that the trial court did not abuse its discretion by imposing consecutive sentences, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Alexander D. Camp, Jackson, Tennessee (on appeal); and James McClain, pro se (at trial), for the appellant, James McClain.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Joshua B. Dougan, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Madison County Grand Jury charged the defendant with alternative counts of aggravated assault for his November 7, 2018 attack on the victim, Shelly Hayes, and one count of witness coercion based upon his forcing the victim to recant allegations she had previously made against him related to an incident that had occurred in Rutherford County.

*Pretrial Proceedings*

Shortly after his November 7, 2018 arrest in this case, the defendant filed the first of more than 30 pro se pleadings in the trial court. In that pleading, the defendant moved the trial court for "a speedy indictment," arguing that the evidence adduced at the preliminary hearing did not warrant the case's being bound over to the grand jury and asserting that swift consideration by the grand jury would ultimately result in dismissal. Just over a week later, the defendant moved to dismiss the case outright. In January, he again moved to dismiss, this time based upon the fact that the case had not yet been submitted to the grand jury. The Madison County Grand Jury returned the three-count indictment on February 25, 2019, and the trial court appointed the public defender's office to represent the defendant on March 4, 2019. Less than a month later, on April 1, 2019, the defendant moved the trial court to relieve first trial counsel for "ineffective assistance." In support of his motion, the defendant alleged that his attorney was "withholding critical evidence" in the form of "CD's videos recordings etc." and that this withholding had "created a counsel client conflict of interest."

Also, on April 1, 2019, the defendant, acting pro se, moved the trial court "for constitutional challenge" and "to intervene." In that pleading, the defendant challenged the constitutionality of the aggravated assault statute, the validity of "the 1861 Corporate Federal State Constitution," and the rendering of his name in capital letters in the indictment, which rendering, he said, evinced that he had not been "charged as a natural person because everything in admiralty and maritime law must be bonded." The defendant filed a handful of pro se motions between April 1, 2019, and April 9, 2019, when first trial counsel moved the trial court for a forensic evaluation of the defendant. The trial court granted the motion and ordered a forensic evaluation to determine the defendant's competency to stand trial, mental condition at the time of the offense, and the extent to which the defendant might be dependent upon drugs or alcohol. The results of the evaluation, reported to the court on May 20, 2019, indicated that the defendant was competent and not dependent upon drugs and alcohol and that an insanity defense could not be supported.

On April 25, 2019, the defendant moved the trial court to "relieve ineffective counsel . . . immediately from his case and appoint another counsel that will be effective, competent, and diligent." The defendant expressed dissatisfaction in first trial counsel's failure to move for dismissal of the indictment for "errors and mistakes." He also complained that counsel had "not filed any motions ect [sic] or put up any defense strategy nor does he communicate adequately with the defendant." The defendant also complained, generally, about the delay in this case despite that there had been no actual delay in his case. In this same vein, on May 30, 2019, the defendant filed pro se a motion to dismiss the indictment, which had been pending for only three months, for a speedy trial violation.

On May 30, 2019, the defendant filed a pro se motion to quash the indictment on grounds that the victim "has had notarized an Affidavit recanting any and all statements, writings, photos, involving the case no here in [sic] and is asking for a dismissal of any and all charges for the release of [the defendant] since January 2, 2019." In that same pleading, the defendant accused the trial court of judicial misconduct for holding a motion hearing without the presence of the defendant[1] and argued that he had presented a "prima facie case of discrimination over a significant period of time" in the selection of grand jurors in Madison County. Additionally, the defendant argued that "the arrest warrant is illegally manufactured and that there was no arrest warrant to begin with in his case." He also asserted that the indictment was invalid because "there were also no police 911 call or nonemergency call to police on 11-7-18 on this alleged date of incident." Finally, the defendant asserted that the trial court should quash the indictment because his "motion for a speedy trial was granted on 2-12-19 and the 70-day statute of limitation has expired well before the original trial date set for 5-23-19 and no waiver of a fast and speedy trial was ever signed or consented by the defendant herein."

On June 10, 2019, the defendant, again filing pro se, moved the court to dismiss the indictment based upon the affidavit allegedly drafted by the victim recanting her allegations against the defendant that led to the indictment in this case. On June 11, 2019, the trial court entered an order relieving first trial counsel and appointing second trial counsel.[2] The trial court also set the case for trial on June 27, 2019.

Despite that the trial court had appointed second trial counsel to his case, the defendant continued to file pro se pleadings. On June 20, 2019, he moved the trial court to dismiss "evidence in this case all items seized by police officers, D.A.'s by means of a warrantless search of the defendant's person on November 7, 2018." On June 25, 2019, he moved the trial court to "Dismiss Rubber Stamp Warrant," arguing that "the rubber stamp warrant supporting the aggravated assault, coercion of a witness, and violation of order of protection charges violates defendant's right to have his person seized only upon a warrant." On that same day, he moved the court to dismiss the case based upon a speedy trial violation.

On June 27, 2019, second trial counsel moved the court to withdraw, and the defendant asked to proceed to trial pro se. The trial court began by explaining the charges and potential penalties to the defendant and questioning the defendant about his familiarity with the law. After being placed under oath, the defendant told the trial court that he had studied the law "[o]n and off." When the defendant claimed that he was "surprised by me

---

[1] The record reflects that the trial court vacated the rulings issued at that hearing and permitted the defendant an opportunity to be heard personally before issuing new rulings.
[2] Other evidence suggests that the defendant had filed a lawsuit against first trial counsel.

being charged with two counts of aggravated assault," the trial court explained that "the violation of the protection order is an aggravated assault charge. That's another way of . . . charging aggravated assault under the statute." Noting the defendant's confusion, the trial court said, "That's part of the problem . . . that I have is that you don't necessarily understand what's going on because you haven't been trained under the law, which makes it hard for you to represent yourself." The court advised the defendant that, should he elect to proceed pro se, "you're essentially on your own." The defendant indicated that he understood that, other than advice from second trial counsel, who the trial court suggested could become elbow counsel, he would be solely responsible for trying the case. The defendant told the trial court that he had "a general idea" of how to enter evidence into the record and, conversely, to object to evidence offered by the State.

The court advised the defendant that, should he elect to testify in his own defense, he would be required to "present your testimony by asking questions to yourself" and would not be permitted to "just get on the stand and start telling a story." The court then warned the defendant:

> Let me tell you this, Mr. McClain. I've told you this once, I'll tell you this again. I think that, in my opinion, you would be far better off represented by an attorney, someone trained in the law, someone with the experience of handling these types of cases.
>
> I think it's very unwise of you to try to represent yourself in this matter. You're not very familiar with the law, you're not familiar with court procedure, you're not familiar with the Rules of Evidence. And I would, again, as I've done on multiple occasions, urge you not to represent yourself. I don't think it's a good choice for you.
>
> So I just want you to understand that's my opinion and . . . . my job in this trial is to make sure that you get a fair trial and that the State gets a fair trial. Okay?
>
> I know less about this case than anybody in this courtroom. And I don't know what's going to happen or how the proof's going to go. But just based on my years of doing this and seeing people represent themselves, it is my understanding and it's my advice to you to have a lawyer.

So in light of that, what I've just said, in light of the
penalty which I've explained to you earlier that you are facing
if you are convicted of this matter or found guilty of this matter,
in light of all the difficulties I think you're going to have in
representing yourself, is it still your desire to represent yourself
and give up your right to be represented by a lawyer?

The defendant responded, "Yes, Your Honor," and then began to complain that his was a malicious prosecution, that his previous counsel "was compromised by the State to do some type of favors," and that the case, which had been pending in the circuit court less than six months at that time, was "really dragging on and on and on." The trial court then asked, "So you think you want to go ahead and represent yourself? It's a simple yes or no answer." The defendant replied, "Yes, sir" and agreed that he had made the decision voluntarily. He also agreed that he had made the decision to proceed pro se "with a full understanding" of his responsibilities at trial and the consequences should he be convicted. He said that he had been neither threatened nor coerced into making the decision.

At that point, the trial court found that the defendant had "knowingly and voluntarily waived his right to counsel" and allowed the defendant to proceed pro se with the assistance of second trial counsel now acting as elbow counsel. The trial court admonished the defendant that he would not "be able to just make general statements every time you stand up" and that the court would "be forced to declare a mistrial" should the defendant "disrupt these proceedings" or "taint this jury in any way."

The court then began to consider the defendant's many pro se pleadings. During the discussion of one of his motions in limine, elbow counsel addressed the court and indicated that the defendant was "threatening to sue me as we sit here today. And I'm not -- I'm happy to answer[] his questions, but I'm not going to stand here and be harassed and threatened all day." The defendant claimed that elbow counsel was "acting like . . . he's not going to help me, he don't want to be here, he don't want to be elbow counsel. He's -- he's acting very prejudicial and biased. I mean, um, I don't see how that -- that he could even assist me with -- He -- he has an attitude." At that point, the trial court said,

If you don't think he can help you here today and you
want to just go solo all by yourself, I would advise you against
that strongly. It's the same questions I've gone over with you.

[Elbow counsel] represents people in this Court on a
regular basis and he always does an excellent job and does his
job vigorously and understands what's going on.

-5-

And basically . . . I'm not going to have time to get somebody else up here to help you, so we're going to have to have a continuance and we'll come back and do it another day, once I can find someone to sit as elbow counsel for you. But I can't get somebody else up here today . . . .

The defendant opposed a continuance, again claiming that his case had "gone on and on" and adding that "every counsel you appoint me" had been "biased, they're presidential [sic], they're discriminative, they're . . . I mean, because of my race I'm being very, very discriminated against. And I just wish that Nathan Pride could have took my case." The trial court replied, "Nobody wishes he would have taken it more than me."[3]

The defendant complained to the trial court that elbow counsel was "tense and really opinionated." The court told the defendant that "sometimes the rules just don't go the way that you want them" and observed that elbow counsel had "an obligation to tell you, if you ask him a question, the correct answer. If you don't agree with it, it doesn't mean he's biased or prejudiced against you. It means that he's trying to give you good advice." The court added,

You are making a bad mistake, first off, by not letting him represent you. It's a horrible mistake. But everybody's got a right to represent themselves. . . . You're making an even more horrible mistake by not letting him assist you. But if you sit here and threaten to sue him, then I'm not going to have much choice but to get rid of him because that puts you in conflict with him.

The court asked the defendant, "Do you want me to remove [elbow counsel] today? . . . Simple question, yes or no." The defendant replied that he did not want the court to remove elbow counsel and instead wanted elbow counsel "to do what I asked him to do." The defendant noted that he had "filed a complaint against [elbow counsel] with the Board of Professional Responsibility. I don't know if that's why he's acting slappy [sic] towards me today." The defendant said that he did not want the court to remove elbow counsel because he "want[ed] to proceed today," again claiming that the case had been "dragging on and on." The defendant then railed at the court about the assistance provided by his previously appointed counsel, claiming that previous attorneys were "illegally representing me with a biased opinion and a biased representation that's ineffective."

---

[3]     The record suggests that the defendant had asked the trial court to have Mr. Pride appointed to his case and that, after being approached by the court, Mr. Pride indicated that he could not do so for reasons that do not appear in the record.

After some back and forth with the court, the defendant, referencing an affidavit purportedly signed by the victim attempting to recant and have the charges against the defendant dismissed, said,

> Every lawyer that you appoint me does not want to enter my evidence, and the knowing of my innocent [sic]. And I will sue them and I will contact the Board of Professional Responsibility.
>
> And that -- that's the -- only hinder the timeframe and -- and hindering my life, because I have severe health issues. And I don't want to be locked up in jail for something that I -- I didn't do.
>
> And I've been here for seven months. And this seems like you being a [sic]officer of the Court and you having statutory authority and common law authority and you are a trustee for the public's trust, that I feel that -- that you should step in and -- and stop this illegal prosecution, this illegal proceeding . . . .

Upon being informed by the court that his own obstreperous conduct was responsible for some of the delay in his case and that "not doing everything you say doesn't mean that your lawyer isn't doing in your best interest," the defendant persisted, saying that he was "reporting a crime here today that you, yourself, the prosecutor and [elbow counsel] are in conspiracy and using the . . . courts to commit this crime here."

Based upon these comments, the court relieved elbow counsel and indicated its intent to continue the case for the appointment of new elbow counsel. The defendant then objected to the court's relieving elbow counsel. The court told the defendant that he could not object "because you sat here and told me you're going to sue him, he's in conspiracy with the State . . . so that puts you in direct conflict with him, which means I can't leave him . . . because that wouldn't be fair to you." The defendant responded, "I'm going to sue the next attorney because you're going to a -- appoint another attorney that's going to be biased and racist and -- and discriminative, too." At that point, the State objected to the continuance, noting that the defendant had "made it real clear that nothing's going to be different in the future." The defendant then objected to the State's objection, claiming that failure to grant the continuance would violate his right to counsel. He claimed that he had asked to represent himself because he had "no other choice" given that the trial court kept "giving me a [sic] ineffective assistance of counsels time after time." The court told the defendant that every lawyer previously appointed to his case had "been a good,

reputable member of the bar in this community, and you've chosen to get in conflict with them." The court informed the defendant that he had "two choices here today. You've told me you want to represent yourself. I've said okay. I think it's a bad idea. Everybody's got a right to represent themselves. I appointed you elbow counsel. You've already threatened to sue him." "So you've got a choice of either representing yourself here today, or if you don't feel that that is what you want to do, I will appoint another lawyer to represent you and we'll get another date and we'll come back. So that's just a simple yes or no answer." The defendant replied, "Let's proceed today."

The defendant then claimed generally that he had not received "all Brady material here in this case," and the court again asked the defendant if he would like "to continue this matter so that you can get more information from the State," noting that the defendant had "had two lawyers. They've both gotten all the discovery material. Both of them have told me that, and they've provided it to you." The prosecutor stated that the district attorney's office had "an open-file policy" and that both of the defendant's previous attorneys had availed themselves of the opportunity to examine and copy items from the State's file. The defendant refused the offer of a continuance and elected to proceed.

*Trial*

Jackson Police Department ("JPD") Sergeant Chad French testified that "[t]here was a proceeding in Rutherford County which generated an order and I requested an order from that court, a copy of that order." The order, which Sergeant French described as "a no-contact order" "usually" given as "a condition of bond on a domestic-related arrest," was dated October 28, 2018, and expressly prohibited the defendant from having any contact with Shelly Hayes. During cross-examination, Sergeant French agreed that all the charges that led to the issuance of the no-contact order were eventually dismissed but explained that the no-contact order was in effect at the time of the incident giving rise to the charge in this case. He added, "[A]t the time of this assault here there was an order which directed the defendant not to have any contact with victim."

During the lunch recess, Jimmy Roberts, one of the witnesses subpoenaed by the defendant, indicated that he had a medical procedure scheduled for that day and asked to be released from his subpoena. The trial court refused to allow him to be released from the subpoena. The defendant then asked the trial court to "just put this off and . . . you give me an attorney so he can go." The trial court refused, saying, "We've got a jury sworn in and we're going. . . . That ship's sailed."

Joyce Corley, vice president of FirstBank and active notary public, testified that on November 7, 2018, she was asked to notarize a paper for someone who was a regular bank customer. The paper said, "'Sincerely, Shelly Hayes'" but did not contain

"any notary information," so Ms. Corley "wrote in State of Tennessee, County of Madison, November the 7th, 2018, and stamped and put My Commission Expires and signed it." She said that she was certain of the date because keeping up with the date was necessary to the performance of her job. Ms. Corley identified Ms. Hayes, who was sitting in the courtroom, as the same person who asked her to notarize the paper on November 7, 2018.

Ms. Corley testified during cross-examination that the victim returned to the bank in January 2019 and asked Ms. Corley to "notarize something else for her." Ms. Corley recalled that the victim referred to the defendant, who was with her on that day, as her fiancé. Ms. Corley described the victim as "nice" and "outgoing."

JPD Domestic Violence Unit Investigator George David Smith testified that he learned that the incident giving rise to the charges in this case took place at The Office Lounge in Jackson. As part of his investigation, Investigator Smith reviewed the video surveillance footage from The Office Lounge from November 7, 2018. The footage he recovered was exhibited to his testimony. Investigator Smith said that he attempted to interview the defendant on November 8, 2018, while the defendant was incarcerated at the county jail. Investigator Smith provided the defendant with *Miranda* warnings and a written rights waiver form, at the bottom of which form the defendant wrote "Under duress" instead of signing the form. Investigator Smith then memorialized the defendant's statement in writing and signed it. Instead of signing the statement with his name, the defendant signed the statement "Under duress." The statement was read into the record:

> Me and my girlfriend, Shelly Hayes, were at The Office Lounge last night. She was intoxicated. She had been drinking all day and also taking a few strong mental meds.
>
> We walked outside to the car to leave. She needed to go back inside to use the restroom. She was very unstable. As she attempted to open the door of The Lounge, she pulled the door open and the door hit her foot as she was leaning in to enter the door.
>
> Her body pushed the door on her head pretty hard and then she fell to the ground. There was nobody outside of the bar but me and her. The witnesses were inside. It may have appeared as though I slammed her head in the door.
>
> She has multiple personalities and is bipolar.

-9-

I did not do this. She was too drunk to be walking. Shelly told me to go ahead and leave in the vehicle because I don't have a driver's license. This white man told me to go on and he would bring her home.

I'm in very bad health, IVC filter, DVT, venous stasis, ulcers in my legs. I'm in no condition to get into any physical altercation with anyone.

Investigator Smith said that he did not even notice that the defendant had signed "Under duress" instead of his signature and admitted that he was "a little embarrassed that I didn't."

During cross-examination, Investigator Smith agreed that "Under duress" was not the defendant's name but said, "James McClain wrote 'under duress' on . . . that one piece of paper. I know that for a fact."

At that point, the defendant attempted to enter into evidence the hearsay statements of witnesses contained in Investigator Smith's file. The State objected, and the trial court sustained the objection. The defendant said, "I'm going to need an attorney, because everything I -- I mean, everything . . . I'm trying to enter here is -- has become hearsay. This is -- is really not fair." The court noted that it had warned the defendant repeatedly about the dangers of representing himself and that the defendant told the court on both occasions that he wanted to represent himself. The court added,

And each time I warned you against it, I strongly advised you against it, and you insisted on doing it. I appointed you elbow counsel and within the first five minutes you decided you didn't want him. I strongly urged you not to get rid of him and you chose to get rid of him.

You wouldn't let me appoint another attorney. And I'm not going to go back now after we've brought this jury up here and spent most of the day. You said you were going to represent yourself and I'm going to let you represent yourself. So I'm not . . . giving you another attorney.

The defendant then attempted unsuccessfully to have the clearly inadmissible documents admitted into evidence. He responded,

I mean, I wish I would have got a[n] attorney now, because I'm not being able to understand the rules of procedure and to enter

-10-

my evidence. And the evidence that I have is -- is critical and it's crucial to my case. You know what I'm saying. I'm getting . . . kind of frustrated whereas everything I try to enter in is being shot down.

The court again observed that it had given the defendant "multiple opportunities to have an attorney and every time I have, you've told me you didn't want one." The court added that it had "advised you against taking this course of action. I appointed you elbow counsel. You didn't want elbow counsel. I advised you against that." The court told the defendant that he would be required to follow the Rules of Evidence and that he would be treated the same as the prosecutor. The court also noted that it had given the defendant "more leeway this morning than any attorney has ever gotten in this courtroom, more leeway than you will ever know, to try to let you do what you're asking me to let you do. So I'm going to do what I can, but at a certain point it becomes not fair to the State if I'm doing that for you."

Upon further cross-examination by the defendant, Investigator Smith testified that he received pictures of the victim's injuries from the victim via cellular telephone. He recalled that on an occasion when he and the victim were together in his office, she told him that emergency personnel had used her telephone to photograph her injuries on November 7, 2018. Investigator Smith said that when he asked the victim to send the pictures to him, "[s]he sent them to me right there." The defendant asked Investigator Smith to read portions of the summary of his investigation into the record. The portion read by the investigator indicated that officers responding to The Office Lounge encountered the victim, who had been injured and who said that the defendant had caused the injuries. According to the summary, witnesses told the responding officers that, shortly after the defendant and the victim exited the lounge, the victim attempted to come back inside and that the door to the lounge was slammed on her head several times "very hard." The victim told officers that she had run back toward the lounge to escape the defendant, her boyfriend, after he told her that he was "going to beat her when they got home" and that when she attempted to open the door, the defendant "apparently kicked the door, which slammed her head up against the outer bricks around the doorframe." The victim was transported to the emergency room for treatment of "a severe laceration to the left side of her head." The defendant "fled the scene in his vehicle right after the assault," and officers located the defendant on Old Hickory Boulevard and took him into custody.

During redirect-examination, Investigator Smith said that he could not positively identify the victim from the video surveillance footage as the person whose head can be seen being slammed in the door of The Office Lounge but agreed that, based upon other evidence in the case, he had confidently concluded that it was the victim's "head that got hit in the door."

-11-

The victim testified that she lived across the street from the defendant's mother and that she began a romantic relationship with the defendant "after ten months of him pursuing me." She described their relationship as "[v]ery controlling, manipulative, very dangerous. I lived in a lot of fear and torment daily." She said that, during her relationship with the defendant, she "was slapped, kicked, punched, thrown up and down stairs" by the defendant. The victim said that she "was not allowed to open my own door [or] look out the window. [The defendant] accompanied [me] to the bathroom or any room I went into in the house. . . . I was not allowed to speak to anyone in public." She explained that she stayed in the relationship because she loved the defendant and because she feared him. She added, "I was afraid of getting killed, really. I was threatened. I've been choked unconscious when I would tell him the relationship wasn't working."

The victim recalled that on November 6, 2018, she drove the defendant's mother to pick up the defendant at the sheriff's department in Murfreesboro. When she and the defendant returned to the victim's residence, the defendant began "the same terrorizing, threatening, intimidating" behavior "that it had always been." The victim said that the defendant "was upset that he may be looking at forty-five years . . . for his actions" during an incident involving her in Murfreesboro, so he forced her to go into

> the bedroom and sit on the edge of the bed. He stood there between my legs and bent over and told me that I was going to write a letter and I was going to do exactly what he said and I was going to write it exactly as he said, because he didn't have a problem killing me for forty-five years that he was looking at for the charges that were in Rutherford County.

The victim agreed to write the letter, and the defendant told her that "he would dictate to me what to write," demanding that she "say that everything I had told on the report in Rutherford County was a lie, that my husband and I . . . falsified a police report just to have him locked away, to get rid of him." The victim insisted that the things she wrote in the letter were false and that the things she had told the police regarding the defendant's actions in Rutherford County were true. The victim said that she drafted the letter because she "was afraid. I mean, he'd already told me if he was looking at so much time it was nothing for him to kill me with his bare hands."

On the following day, November 7, 2018, the victim and the defendant went to the bank to have the letter notarized because the defendant "said I had to." The victim identified the letter that she wrote at the behest of the defendant and that was notarized by Ms. Corley. In the letter, which was exhibited to her testimony, the victim stated that she "was coerced by my husband Alan Hayes while in a drug induced state to falsely accuse

James McClain of domestic assault and vandalism" and that she intended the letter "to clear James McClain of any and all charges regarding the date October 27, 2018." She concluded by asking that the court "dismiss any charges against James McClain in the above mentioned cases." The victim testified that the defendant forced her to write the letter because "[h]e was trying to have a case . . . dismissed. He needed all those charges gone away because he was already on parole."

Later that same evening, the victim and the defendant went to The Office Lounge "to shoot some pool . . . just to get out for a little bit." The victim identified the still photographs taken from The Office Lounge and viewed the video surveillance footage from November 7, 2018. She identified herself on the video surveillance footage by the clothing she was wearing: a "black and red and white" "jogging suit" and tennis shoes. She said that she and the defendant ordered a pitcher of beer and shot "maybe four or five games of pool." She recalled that the defendant "began to flirt with a couple of the white girls over in the corner," and he turned to her and said, "'I can't wait to get you completely out of my life.'" The victim "looked at him and said, 'I agree.'" A few minutes later, the victim and the defendant left The Office Lounge. The victim testified that they walked to the car, and the defendant said that "[w]hen he got me home he was going to beat my mother f****** a**." The victim said that "[p]anic and fear came up" in her thoughts and that she "said to him, 'I'm not going home with you.'" At that point, the victim "took off running and I could hear him . . . coming after me."

The victim testified that she ran toward The Office Lounge, "put my hand on the door and I jerked it open and I took one step through, and then I felt nothing but pressure on my head. And I dropped to my knees and screamed, 'Oh, my head.'" The victim identified her head as the one depicted in the video surveillance footage being slammed repeatedly between the door and the doorframe. The victim next recalled sitting in the parking lot with a crowd of people around her. She said that her "breast and back were getting so hot," and she "looked down and my gray shirt was bloody." She said that she did not realize the extent of her injuries. The victim wrapped her jacket around her head in an effort to stanch the bleeding. An ambulance arrived and transported her to Regional Hospital in Jackson, where she asked a nurse to take photographs of her injuries with her cellular telephone. The photographs were exhibited to her testimony. She identified the "pretty gruesome" injury as "[h]ow much damage a . . . steel door can do to your head." The victim said that doctors "had to build from the deepest parts of the wound out with stitching." They told her that "the gash was all the way down to the skull, which meant that they went through two layers of muscle."

The victim admitted having consumed beer from the pitcher she shared with the defendant but denied being heavily intoxicated. The victim acknowledged that in January 2019, she wrote another letter and had it notarized. The purpose of the January

2019 letter "was to recant the pictures and anything I'd said in the preliminary hearing" in this case. She said that she drafted the letter at the behest of the defendant because she wanted "to make it all go away" and so that she "would be safe, because I had been threatened before if [the defendant] ever went back to prison what would happen to me." She said that she went to Investigator Smith a couple of days later and recanted the contents of the January 2019 letter, saying that she decided to tell the truth "[b]ecause that's what happened. I can't . . . further anything with a lie."

During cross-examination by the defendant, the victim said that she endeavored to have the charges in this case dismissed because the defendant's "family was threatening me" and because she had rekindled her romance with the defendant. The victim insisted that the defendant coerced her to draft the statement recanting her allegations against the defendant "to remove myself so that this would go away so that [the defendant] would have no trouble." The victim acknowledged that she had not sought an order of protection against the defendant in Rutherford County and that charges stemming from the incident there were eventually dismissed. The victim said that she had not "deceived the courts in Murfreesboro," explaining, "You had threatened everyone and their job and some more things. That's why nobody showed up." The victim agreed that she had asked Ms. Corley to notarize items for her and said that it was possible that she seemed happy at the time because she "did think it would all go away; maybe he would back off, maybe he would stop torturing and tormenting and threatening and intimidating me." She added, "I just knew I did what I was told to do, because if I didn't and . . . he ever went to prison, that when he found me when he got out no matter how long it took, he was going to kill me with his bare hands slowly."

The defendant's cross-examination of the victim can best be described as volatile, and the court was eventually forced to take a recess in order to explain to the defendant that he was not permitted to testify while cross-examining the witness or to argue with the answers she provided to his questions. The defendant complained that the trial court was biased against him and demanded an immediate appeal. When the defendant attempted during the recess to admit certain letters written to him by the victim, the State objected under Rule 613, and the trial court sustained the objection because the victim had admitted writing the letters in question. The defendant replied, "They're making a mockery of me in the courtroom."

When the defendant's questioning of the victim again became excessively argumentative and repetitive, the trial court conducted a jury-out hearing in the hallway. The trial court warned the defendant:

Here's the deal, Mr. McClain. I'm doing everything I can to help you get a fair trial, but you don't get to just make blatant statements or ask me questions.

. . . . I'm giving you more leeway than I would ever give anybody in a case. And I'm trying my best to be overly fair with you. But you don't get to just make blatant statements about someone, whether they're lying. You don't get to -- If you want to call her a liar during your closing argument, you can do it. But that is not the time for it right now.

We've gone over this stuff. You're plowing the same ground over and over and over, and the jury's heard it. And I would either go on to some new questions or we're going to -- We're going to move on. It's just that simple."

. . . .

The reason I come over here is because if I say some of this stuff in front of the jury, it makes it unfair to you. . . ."

The defendant replied, "It's already unfair to me," complaining that he did not "have all the evidence" to present his case, specifically lamenting his lack of a transcript of the preliminary hearing. The defendant asserted that he was "not even prepared to even prepare a proper defense," to which the court responded, "And this goes back to the discussion we've had three other times. And I'm not going to plow through that ground again. You chose to represent yourself. Follow the rules. Within the rules I'll do my best to give you a little leeway, but I can't let you have the farm."

Upon further cross-examination by the defendant, the victim conceded that she had contacted the attorneys handling the defendant's medical malpractice claim in order to provide them with the defendant's address at the jail. The victim admitted that the defendant had paid her bills for a period of time and had purchased tires for her vehicle, although she qualified her answer by adding, "Tires that . . . you burst with a knife yourself and then replaced again, and all kinds of good stuff." The victim acknowledged that she had previously used illegal drugs and that she had specifically used methamphetamine with the defendant, noting that, on one occasion, the defendant had "started to cut open my mattress and then you pulled up the flooring in the closet because someone was coming through our apartment, remember, James?"

-15-

At the conclusion of the victim's testimony, the State rested. The trial court then asked the defendant if he intended to testify, cautioning him that he had "an absolute right to testify but you do not have to testify," or put on any witnesses. The defendant expressed confusion and frustration, saying, "I don't know what I should do. . . . This case is a disaster, really. I mean, I don't . . . know what I'm doing here." The defendant indicated he intended to call Jimmy Roberts as a witness and to recall Ms. Corley, Investigator Smith, and the victim. The court warned the defendant that he was not permitted to recall the witnesses to "ask the same questions you've already asked."

With the trial court's guidance, the defendant moved for a judgment of acquittal, arguing that the case "lack[ed] probable cause" because "there's no recorded 911 calls." He also argued that the State had not presented any witness who had seen "a door being slammed on [the victim] or any assault ever occurring" and that there were "inconsistencies in the addresses" of The Office Lounge contained in the indictment. The trial court denied the motion, and the defendant elected to present proof.

Jimmy L. Roberts, manager of The Office Lounge, testified that the lounge was located at 82 Federal Drive. He said that he had reviewed the video surveillance footage from November 7, 2018, and that "police inspectors" copied the footage to "a flash drive." Mr. Roberts stated that, despite the lack of a time stamp on the footage, he knew that the footage obtained by the police was from the evening of November 7, 2018, "[b]ecause I located it myself after the incident, the following day." He insisted that the footage had a time and date stamp "when I viewed it on the" monitor and that "[i]t was certainly not manipulated by us." Mr. Roberts reviewed the footage that had already been admitted into evidence and agreed that the video played for the jury did not show the time and date. He explained, however, that the time and date displayed "[w]hen you view it with all ten cameras on the monitor" and that "it does not come up on each single individual camera."

The defendant recalled Investigator Smith, who testified that Ms. Corley provided him with a statement via email "saying that [the victim] came in and she notarized something for her. That's it." He said that although Ms. Corley did not indicate that the victim told Ms. Corley that the defendant had coerced her to write the letters, the victim had "told me many times that [the defendant] was basically forcing her to write these letters and have them notarized and spread around." The defendant prompted the investigator to read the victim's statement regarding the notarized letter to him. That statement comported with the victim's testimony that she had written the letter and had it notarized after the defendant threatened "to kill me dead with his bare hands" unless she wrote "a letter written exactly the way he said to write it." Investigator Smith indicated that the no-contact order in the Rutherford County case was issued by a judge and was not a formal order of protection sought out by the victim.

-16-

At the conclusion of Investigator Smith's testimony, the court recessed for the day. On the following morning, the defendant moved to dismiss the case on grounds that the State had not obtained a valid warrant for his arrest, a claim that had been previously raised and rejected multiple times. The trial court denied the motion, and the defendant asked to enter a document into the record, and the trial court denied his request. At that point, the defendant again complained that he was "not skilled at law" and "had no idea of how to enter evidence into the record." The court told the defendant that it would not "rehash" the issue, noting that it had given the defendant "every opportunity to have a lawyer and you chose to go forward with yourself knowingly and voluntarily and made an intelligent decision on that." The defendant then complained, as he had myriad times before, that the indictment was invalid because it did not bear the signature of the grand jury foreman. The trial court explained, as it had myriad times before, that the copy that the defendant had was just that, a copy, and that the original indictment "has a signature on it. It's in the file. It's a stamped filed copy in the file." The defendant complained that he did not have a stamped filed copy, and the court agreed to get him one. Unsatisfied, the defendant said, "I mean, that would be illegal. . . . That's a surprise to me," and argued that "it's a violation of my due process." The court found that "[i]t's not a surprise," given that the defendant had been told more than once that the original, file stamped copy of the indictment was in the court file, and denied the motion. The defendant then made "a motion to impeach" the victim "for, um, perjury and . . . conflicting testimony. She lied under oath." As support for his "motion," the defendant pointed out that the victim "wrote a . . . affidavit of recantment" in January 2019. The court denied the motion, and the defendant asked to enter "this affidavit of recantment into the record for evidence as an exhibit." The court told the defendant that, should he comply with the rules of evidence, the document could be admitted into evidence but that the court would not tell him how to do it or give him "a cue that says, 'Now is the time to do it.' That's what you're supposed to do in representing yourself."

The defendant recalled the victim, who testified that she recanted the statements she had made in the notarized affidavits "[a]fter no contact and you not in my head or my ear for two or three months." When asked why she had lied when the video surveillance footage "did not show Mr. McClain in this bar with you," the victim replied, "It did show you in the bar with me. Are you delusional?"

The defendant's questioning of the victim again got out of control, and the trial court held a jury-out hearing to admonish the defendant and the victim about their behavior. During that hearing, the defendant again attempted to enter into evidence letters the victim had written him that contradicted her testimony, and the trial court ruled that he could not admit the letters because the victim had admitted having written them. The defendant then complained that he needed an attorney, saying, "I asked you, pleaded with

-17-

you, to give me an attorney after I acknowledged that I had made you send my attorney away that was supposed to stand as elbow counsel. I clearly needed a[n] attorney." The defendant complained that the trial court "didn't tell me the Rules of Procedure," to which the trial court replied, "It's not my job to tell you the rules and procedures. I told you yesterday I was not going to be able to do that for you, I was not going to be able to try your case for you, which was why I strongly urged you to have a lawyer."

Upon further questioning by the defendant, the victim identified the defendant from the video surveillance footage and said that she was "[a]bsolutely positive one hundred percent" confident in her identification.

The defendant recalled Ms. Corley in a back-door attempt to enter hearsay documents into evidence. The trial court refused to permit the defendant to re-call Investigator Smith.

After a full *Momon* hearing, the defendant elected to testify. The defendant said that he did not assault the victim on November 7, 2018, and that, indeed, he was not even present at The Office Lounge on that date. He denied that he was the person identified by the victim from the video surveillance footage. He theorized that the attacker was one of the victim's "ex-boyfriends, a guy named Eric. It might be him, but it's not me."

Marilyn Colter, the defendant's mother testified and recalled the victim's telling her that she recanted her statement incriminating the defendant. Ms. Colter testified that the victim had made false allegations against Ms. Colter.

The defendant rested his case but, during the jury charge conference, attempted to enter more evidence. When told by the trial court that "[w]e're not getting any more evidence in," the defendant said, "I don't know what to say. I don't know what to do. I . . . have absolutely no idea of what's going on whatsoever in this courtroom." He added, "I'm totally blindsided by this whole scene."

Based upon this evidence, the jury convicted the defendant as charged of two counts of aggravated assault and one count of witness coercion. The trial court approved the verdict as 13th Juror. Following a sentencing hearing, the trial court imposed a total effective sentence of 15 years' incarceration. The defendant filed a number of post-trial motions, including at least six motions for new trial, all of which the trial court denied. In this appeal, the defendant argues that the trial court erred by permitting him to proceed pro se, by allowing the case to proceed on an improperly amended indictment, and by imposing consecutive sentences.

## I. Waiver of Right to Counsel

The defendant first contends that the trial court erred by permitting him to proceed pro se because he did not execute a written waiver and argues that, due to his lack of education, he was unable to effectively represent himself at trial. He also claims that the written waiver of rights form that the defendant executed before providing a statement to Investigator Smith cannot be construed as a waiver of the right to counsel at trial and that, in any event, the defendant signed the document "Under duress" instead of his actual name, rendering that document invalid. We agree with the defendant that the signed rights waiver form cannot be construed as a written waiver of the right to counsel at trial. That the defendant signed the form with "Under duress" instead of his actual name had no legal effect and is irrelevant to our determination whether the trial court erred by permitting the defendant to proceed pro se. The State counters that the trial court properly determined that the defendant waived his right to counsel and wished to proceed pro se.

A criminal defendant has a right to be represented by counsel or to represent himself and proceed pro se without the assistance of counsel. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 9; *Faretta v. California*, 422 U.S. 806, 819 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). "[T]he right of self-representation and the right to counsel are alternative rights. In any particular proceeding, a person may assert one or the other, but not both." *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009) (citing *State v. Berry*, 141 S.W.3d 549 app. at 573-74 (Tenn. 2004)). To activate the right of self-representation, the defendant must: (1) timely assert the right to proceed pro se; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. *State v. Hester*, 324 S.W.3d 1, 30-31 (Tenn. 2010). Tennessee Rule of Criminal Procedure 44 provides that, "[b]efore accepting a waiver of counsel, the court shall:

> (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and
>
> (B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

Tenn. R. Crim. P. 44(b)(1). To facilitate the determination whether the defendant has made "a competent and intelligent waiver," this court has recommended that trial courts rely on the questions set forth "in Bench Book for United States District Judges." *State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (citing *United States v. McDowell*, 814 F.2d 245, 251-52 (6th Cir. 1987)). The "Bench Book" lists some 16 questions, all designed to

-19-

emphasize the gravity of self-representation and determine the defendant's ability to proceed pro se.

"[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399 (1993); *see also Hester*, 324 S.W.3d at 31 (Tenn. 2010). "A defendant need not have legal training or experience in order to competently and intelligently elect self-representation." *State v. McCary*, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003) (citing *Faretta*, 422 U.S. at 835). Indeed, "the defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel." *Godinez*, 509 U.S. at 400. "Deficiencies in legal skills and legal knowledge do not deprive a person of his or her right to self-representation." *Hester*, 324 S.W.3d at 32. The only exception to this general rule, which is not applicable here, exists "for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). It follows, then, that "when a defendant is apprised of the dangers and disadvantages of self-representation so that 'he knows what he is doing and his choice is made with eyes open,' and yet chooses to proceed pro se, his performance at trial is not relevant as to whether there was a valid waiver made prior to trial." *Northington*, 667 S.W.2d at 61-62 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). "Thus, any determination must not rest upon a retrospective view that the defendant here exercised incredibly poor judgment in the exercise of his power to waive counsel." *State v. Gillespie*, 898 S.W.2d 738, 741 (Tenn. Crim. App. 1994).

Our standard of review of a defendant's exercise of the right of self-representation is a mixed question of law and fact, *see Hester*, 324 S.W.3d at 29, which we review de novo with a presumption of correctness as to the trial court's factual findings, *State v. Holmes*, 302 S.W.3d 831, 837 (Tenn. 2010).

The record supports the finding of the trial court that the defendant knowingly, voluntarily, and intelligently waived his right to counsel and elected to proceed pro se. The defendant evinced a desire to represent himself from the outset by filing numerous pro se pleadings beginning within a month of his arrest. After the defendant expressed dissatisfaction with his first appointed attorney, the trial court permitted the attorney to withdraw and appointed new counsel. The defendant continued to file pro se pleadings in the trial court throughout the time he was represented by counsel, and many of these pleadings included complaints about the quality of the representation provided by his attorneys. At some point, the defendant expressed a desire to represent himself. Although this initial request is not in the record, the trial court's discussion of the issue with the defendant on the first day of trial indicates that that discussion was not the first on

the issue. On the first day of trial, the trial court placed the defendant under oath and then asked the defendant a series of "questions . . . intended to determine whether or not you can represent yourself." The trial court inquired about the extent of the defendant's knowledge of the law, and the defendant indicated that he had studied the law "on and off." The trial court advised the defendant of the nature of the pending charges, including the fact that the alternative charges of aggravated assault would be subject to merger, and the potential punishments should the defendant be convicted. The trial court warned the defendant that he would be "essentially on your own" and told him that he would be responsible for familiarizing himself with the rules of evidence and procedure. The defendant insisted that he had "a general idea" of both. The trial court then cautioned the defendant in the strongest language that it could that electing self-representation was a "horrible idea." The defendant stated that he nevertheless wanted to proceed, that his decision had been made voluntarily "with a full understanding of what your responsibilities are going to be" and "the consequences of what happens if you are convicted," and that he had not been threatened or coerced into making the decision. Based upon this sworn testimony, the trial court concluded that the defendant had knowingly, voluntarily, and intelligently elected to represent himself.

The trial court initially appointed elbow counsel to assist the defendant in representing himself. During a discussion of the defendant's pending pro se motions, however, elbow counsel informed the court that the defendant was "threatening to sue me as we sit here today." After a lengthy discussion, the defendant acknowledged that he had filed a complaint against elbow counsel with the board of professional responsibility. The trial court offered to continue the trial to find new elbow counsel, but the defendant opposed any delay. The defendant then indicated an intent to "sue" every appointed attorney who refused "to enter my evidence" and accused elbow counsel of being in a conspiracy with the State to illegally convict him of a crime. At that point, the trial court relieved elbow counsel and indicated its intent to continue the case for the appointment of new elbow counsel. The defendant objected to the court's relieving elbow counsel. The court overruled the defendant's objection, stating that the defendant had created a conflict of interests with elbow counsel by threatening "to sue him" and accusing him of a "conspiracy with the State." The defendant responded, "I'm going to sue the next attorney because you're going to a -- appoint another attorney that's going to be biased and racist and -- and discriminative, too." The trial court then told the defendant that he could either proceed with the trial that day and represent himself without the assistance of counsel "or if you don't feel that that is what you want to do, I will appoint another lawyer to represent you and we'll get another date and we'll come back. So that's just a simple yes or no answer." The defendant replied, "Let's proceed today." Under these circumstances, the defendant both explicitly and implicitly waived the assistance of elbow counsel. *See State v. Parsons*, 437 S.W.3d 457, 487 (Tenn. Crim. App. 2011) ("The [d]efendant's entire course of conduct demonstrates beyond any doubt that he fully intended to control the proceedings and to fire

and/or intimidate and/or refuse to cooperate with any lawyer—or any judge, for that matter—that did not obey his every command.").

To be sure, no written waiver of the right to counsel appears in the record on appeal, and nothing else in the record suggests that the defendant executed such a waiver that was inadvertently omitted from the appellate record. Rule 44 requires that "[a] waiver of counsel shall be in writing" and that the written waiver must be "in the record." Tenn. R. Crim. P. 44(b)(2)-(3). That being said, the rule does not specify a particular form that the written waiver must follow, *see, e.g.*, *State v. Gregory Scott Battles*, No. W1998-00558-CCA-R3-CD, 1999 WL 1525475, at * 8 n. 5 (Tenn. Crim. App., Jackson, Dec. 30, 1999) (stating that repeated filing of pro se motions "initiated by the defendant" were "sufficient to satisfy the written waiver requirement"), and this court has held that the absence of a written waiver "does not necessarily preclude a constitutionally valid waiver," *State v. Vincent Hatch*, No. W2000-01005-CCA-R3-CD, 2001 WL 1268442, at *6 (Tenn. Crim. App., Jackson, Oct. 19, 2001) (citing *State v. Goodwin*, 909 S.W.2d 35, 39-40 (Tenn. Crim. App. 1995); *State v. Mohammed F. Ali*, No. 03C01-9802-CR-00065, 1999 WL 639689, at *3-4 (Tenn. Crim. App., Knoxville, August 24, 1999); *Luther Fowler v. State*, No. 03C01-9711-CR-00509, 1999 WL 552938, at *10-11 (Tenn. Crim. App., Knoxville, July 30, 1999)); *see also State v. Simmie Black*, No. 02C01-9803-CR-00081, 1999 WL 280810, at *4 (Tenn. Crim. App., Jackson, May 7, 1999).

In this case, the defendant began filing pro se pleadings in the trial court within a month of his arrest. He continued to file such pleadings even after the appointment of counsel and, indeed, after the trial court instructed him that he should not make pro se filings while represented by counsel. Although the defendant did not specifically make a request to proceed pro se, several of these pleadings indicated that the defendant was displeased with the assistance being offered by his appointed counsel. Most importantly, as indicated above, the trial court thoroughly questioned the defendant about his desire to represent himself and more than thoroughly cautioned the defendant about choosing self-representation. Following this hearing, the trial court entered a written order finding

> that the [d]efendant is well aware of the consequences of his decision to represent himself and therefore, the motion is well-taken and should be granted. Specifically, the Court finds that the [d]efendant testified, under oath, that he knowingly, intentionally, intelligently, and freely intends to represent himself at his jury trial and waives his right to appointed counsel and will further comply with the rules of evidence and criminal procedure.

Additionally, we note that the defendant had previously demonstrated an unwillingness to sign written waivers and acknowledgements. Under these circumstances, it is our view that the absence of a written waiver does not entitle the defendant to relief.

## II. Amendment of Indictment

The defendant next contends that the trial court erred by "allowing the State to proceed with an amended indictment reflecting two counts of aggravated assault after the court's order denied the State's request to amend the indictment." We need not tarry long over this claim, however, because, as the State correctly points out, none of the offenses charged in the indictment was ever amended. Prior to trial, the State moved the trial court to amend *the cover page* of the indictment because it erroneously listed the offense charged in Count 1 as "Violation of Order of Protection" when, in reality, that count charged the offense of aggravated assault pursuant to Code section 39-13-102(c). The trial court denied the State's motion to amend the cover page without analysis despite that the amendment would not have charged the defendant with any new or different offense.

Code section 39-13-102(c) provides:

A person commits aggravated assault who, after having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against the individual or individuals.

T.C.A. § 39-13-102(c). The language of Count 1 clearly tracks the language of and refers directly to the statute:

THE GRAND JURORS of Madison County, Tennessee, duly empaneled and sworn, upon their oath, present that

James McClain

on or about November 7, 2018, in Madison County, Tennessee, and before the finding of this indictment, did intentionally and/or knowingly cause or attempt to cause bodily injury to SHELLY HAYES, after having been enjoined or restrained by Court Order from in any way causing or attempting to cause

-23-

bodily injury or an assault against the said SHELLY HAYES,
in violation of T.C.A. § 39-13-102(c), all of which is against
the peace and dignity of the State of Tennessee.

"[I]t is squarely the responsibility of the district attorneys general in this state to ensure that indictments are properly drafted." *State v. Sharrad Sharp*, No. W2018-00156-CCA-R3-CD, 2019 WL 960431, at *9 (Tenn. Crim. App., Jackson, Feb. 26, 2019). The indictment cover page clearly contained a clerical error, but the State's attempt to correct the clerical error was thwarted by the trial court. Given that the language of Count 1 charged the offense of aggravated assault using the language of Code section 39-13-102(c) and that it contained a reference to that statute, we conclude that the indictment provided constitutionally sufficient notice of the offense charged. Further, we find that the discrepancy between the cover page and Count 1, particularly given that the State attempted to correct the error prior to trial, does not entitle the defendant to relief.

*III.  Sentencing*

Finally, the defendant asserts that the trial court erred by imposing consecutive sentences, arguing "that for what he was charged with a concurrent sentence would be more appropriate." The State contends that the trial court did not err.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*,

-24-

the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

In our view, the record supports the sentencing decision of the trial court. While he was on bond and subject to a no-contact order for a domestic violence incident with the victim, the defendant slammed the victim's head in the door of The Office Lounge, lacerating her scalp all the way to the skull. Following both incidents, the defendant threatened and intimidated the victim to write, sign, and have notarized letters claiming that the defendant had not assaulted her. The trial court made the proper findings to support its conclusion that the defendant was a dangerous offender. Indeed, the defendant does not challenge either the trial court's finding that he had an extensive criminal history or that he was a dangerous offender and argues only that concurrent sentence alignment "would be more appropriate."

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-25-